[No. S149178. June 1, 2009.]

PAUL MILLER et al., Plaintiffs and Appellants, v.
BANK OF AMERICA, NT & SA, Defendant and Appellant.

**Counsel**

The Sturdevant Law Firm, James C. Sturdevant, Mark T. Johnson, Monique Olivier; Law Offices of Thomas J. Brandi, Thomas J. Brandi and Brian J. Malloy for Plaintiffs and Appellants.

Barbara Jones, Rochelle Bobroff, Michael Schuster; Deanne Loonin, Lauren Saunders, Margot Saunders; Gerald McIntyre; and Richard Rothschild for AARP Foundation Litigation, National Consumer Law Center, National Senior Citizens Law Center, Congress of California Seniors and Western Center on Law and Poverty as Amici Curiae on behalf of Plaintiffs and Appellants.

Eric Halperin, Kathleen Keest, Amanda Quester, Melissa Briggs and Daniel Mosteller for Center for Responsible Lending as Amicus Curiae on behalf of Plaintiffs and Appellants.

Bramson, Plutzik, Mahler & Birkhaeuser and Robert M. Bramson for National Association of Consumer Advocates as Amicus Curiae on behalf of Plaintiffs and Appellants.

Levy, Ram & Olson and Arthur D. Levy for California Reinvestment Coalition as Amicus Curiae on behalf of Plaintiffs and Appellants.

Thomas J. Miller, Attorney General (Iowa); Fazio Micheletti and Jeffrey L. Fazio as Amici Curiae on behalf of Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Deputy Legal Affairs, Tom Greene, Chief Assistant Attorney General, and Herschel T. Elkins, Special Assistant Attorney General, as Amici Curiae on behalf of Plaintiffs and Appellants.

Marc A. Lackner; O'Melveny & Myers, Walter Dellinger, Debra S. Belaga, Jonathan D. Hacker, Matthew D. Roberts; Morrison & Foerster, Arne D. Wagner, Arturo J. González and Heather A. Moser for Defendant and Appellant.

Coblentz, Patch, Duffy & Bass, Jonathan R. Bass and Susan K. Jamison for California Bankers Association and California Credit Union League as Amici Curiae on behalf of Defendant and Appellant.

Arnold & Porter, Laurence J. Hutt, Howard N. Cayne and Nancy L. Perkins for American Bankers Association, America's Community Bankers, Consumer Bankers Association, Credit Union National Association, Financial Services Roundtable and Independent Community Bankers of America as Amici Curiae on behalf of Defendant and Appellant.

Peter D. Keisler, Assistant Attorney General, Jeffrey S. Bucholtz and Michael F. Hertz, Acting Assistant Attorneys General, Kevin V. Ryan, Scott N. Schools and Joseph P. Russoniello, United States Attorneys, William Kanter, Howard S. Scher and Thomas M. Bondy for the United States of America as Amicus Curiae on behalf of Defendant and Appellant.

## OPINION

**MORENO, J.**—Relying upon our decision in *Kruger v. Wells Fargo Bank* (1974) 11 Cal.3d 352, 356 [113 Cal.Rptr. 449, 521 P.2d 441] (*Kruger*), account holders who deposited Social Security or other public benefit funds into checking or savings accounts and then overdrew those accounts contend that Bank of America, NT & SA, may not recoup the overdrawn amounts and charge insufficient funds fees for each transaction that results in an overdraft. In *Kruger*, we held that a bank may not satisfy a credit card debt by deducting the amount owed from a separate checking account containing deposits that "derived from unemployment and disability benefits" and, thus, were "protected from the claims of creditors." (*Ibid.*) One year later, the Legislature enacted Financial Code section 864, which comprehensively governs the manner in which banks may exercise the right to set off debts. Financial Code section 864, subdivision (a)(2) expressly excludes overdrafts and bank charges from the statute's definition of debt. We conclude that Bank of America's practice does not run afoul of our holding in *Kruger* because the setoff of independent debt at issue in *Kruger* is not implicated here. We further conclude that Bank of America's practice of recouping overdrafts and charging insufficient funds fees is permissible in light of the Legislature's unequivocal statement in Financial Code section 864 that overdrafts and bank charges are not debts and are therefore not subject to the limitations placed on a bank's right of setoff set forth in that statute. Because we conclude that Bank of America's practices do not violate state law, we do not reach the issue of federal preemption. Accordingly, we affirm the judgment of the Court of Appeal.

## I. Background

Representative plaintiff Paul Miller (Miller) receives Supplemental Security Income[1] benefits via direct deposit into his checking account with defendant Bank of America (the Bank). Miller has maintained an account with the Bank since 1975, and he began receiving SSI in 1992. Miller testified that he began having his SSI payments directly deposited into his checking account in 1994 after bank employees assured him that his deposits would be safe from debits or charges absent his authorization.

In January 1998, the Bank erroneously credited $1,799.83 to Miller's account. In April 1998, the Bank realized its error and reversed the credit to Miller's account without obtaining Miller's authorization or providing him with notice. The reversal caused a negative balance in Miller's account that depleted his May 1998 SSI payment as soon as it was directly deposited. Miller complained to the Bank that the reversal of the erroneous credit caused a negative balance in his account, completely depleting his SSI deposit, and he would be unable to pay rent and other living expenses that month.[2] The Bank advised Miller that he would be responsible for repaying the portion of the erroneous credit that he had spent, but he could open a separate checking account for his SSI deposits that would not be used for repayment. The Bank opened a new checking account and deposited Miller's previously deducted May 1998 SSI benefit funds into it. In June and July 1998, the Bank again used the SSI funds directly deposited into Miller's new checking account to repay the negative credit in his original account. Miller complained each time, and each time the funds were later restored.

From time to time, Miller overdrew his account, and the Bank recouped those overdrafts and associated insufficient funds (NSF) fees from his directly deposited public benefit funds. Bank employees testified that the Bank automatically deducted overdrafts and NSF fees from directly deposited funds, regardless of the source of those funds. Social Security funds received

---

[1] During trial, an expert on the economics and politics of aging, including the Social Security system, testified regarding two types of Social Security benefits: Old Age, Survivors, and Disability Insurance (OASDI) and Supplemental Security Income (SSI). The expert testified that OASDI "provides benefits to aged, retired, . . . severely disabled persons, . . . some survivors, and also to some dependents like children of a deceased worker," and is available "based on [an individual's] work contributions into the Social Security trust funds or on the contributions of a family member through their work into the trust funds." SSI is a separate program, providing "benefits to very low income, aged, blind, [or] disabled persons."

[2] At the time of these incidents, Miller's sole source of regular income was the $670.40 he received each month in SSI benefits.

no special treatment or protection.[3] As of 2004, the Bank's NSF fees ranged from $14 per transaction to $32 per transaction, and up to five NSF fees could be levied in a single day, for a total daily NSF fee of $160.

The Bank executive in charge of the Bank's checking products testified that, in order to prohibit certain account holders from overdrawing their accounts (which would eliminate the Bank's need to recoup overdrafts or charge NSF fees), the Bank would have to "bounce" more checks, withhold check deposits for the maximum allowable period of four days instead of one or two days before the Bank would make the funds available for withdrawal, eliminate point-of-sale purchases (but not personal identification number (PIN) transactions), and restrict automated teller machine (ATM) withdrawals from non-Bank ATM's. The Bank posts checks, or processes transactions, each day in order of largest to smallest based on its belief that larger transactions are more important, and therefore should be cleared first. When an account contains insufficient funds to cover the checks or point-of-sale transactions, the Bank's practice of processing larger transactions before smaller ones results in the same total amount being overdrawn from a particular account, but increases the number and amount of NSF fees imposed.

Miller initiated the instant representative action, and in his first amended complaint filed on August 13, 1998, alleged fraud, negligent misrepresentation, and intentional infliction of emotional distress, as well as violations of Code of Civil Procedure section 704.080; the Consumers Legal Remedies Act (CLRA), Civil Code section 1750 et seq.; the unfair competition law (UCL), Business and Professions Code section 17200 et seq.; and the false advertising act, Business and Professions Code section 17500 et seq.

On October 16, 2001, the trial court denied in part and granted in part the Bank's motion for summary judgment and summary adjudication. The trial court granted the Bank's motion for summary adjudication with respect to plaintiff's claims for violation of Code of Civil Procedure section 704.080, and for intentional infliction of emotional distress, and denied the Bank's motion for summary judgment with respect to all other claims. The trial court found that triable issues of fact remained regarding the fraud, negligent misrepresentation, CLRA, UCL, and false advertising claims as to whether the Bank made false or misleading statements concerning the availability of directly deposited funds, whether the Bank had a practice of debiting public benefit

---

[3] The Bank executive responsible for business decisions concerning the Bank's checking products testified that the Bank possessed or could develop the capability to identify accounts into which public benefit funds are directly deposited, and could bypass charging NSF fees to those accounts.

funds to collect overdrafts and other charges, and whether the Bank's practices as applied to plaintiff violated the UCL.

On the same day, the trial court also certified a class consisting of "[a]ll California residents who have, have had or will have, at any time after August 13, 1994, a checking or savings deposit account with Bank of America into which payments of Social Security benefits or other public benefits are or have been directly deposited by the government or its agent." As the Court of Appeal noted, "[i]n 2003, the Bank had 1,079,414 such accounts. Each month more than $800 million in government benefits is electronically deposited into class members' accounts. Between January 1994 and May 2003, the Bank debited at least $284,211,273 in NSF and other overdraft fees from accounts containing Social Security direct deposits." Although SSI benefits constituted Miller's primary source of income, the class consisted of all Bank customers who received directly deposited public benefit funds without regard to whether those class members had available alternate sources of income to cover their basic living expenses.

On February 25, 2004, following a bifurcated trial in which the jury considered CLRA issues and the trial court also considered CLRA issues, as well as UCL and false advertising issues, the jury returned its verdict, finding that the Bank violated the CLRA by "falsely represent[ing] that it ha[d] the right to use Social Security funds from direct deposit accounts that receive government benefits including Social Security funds to pay overdrafts, insufficient fund[s] fees, . . . and money claims it has against class members." The jury awarded $75,077,836 in compensatory damages to the class, and awarded $1,000 in statutory damages to each class member who suffered substantial economic or emotional damage. The jury also found that Miller suffered emotional distress as a result of the Bank's conduct, and awarded him individual damages in the amount of $275,000.

On December 30, 2004, the trial court issued its statement of decision following a bench trial regarding plaintiffs' CLRA, UCL, and false advertising claims. Relying on *Kruger, supra,* 11 Cal.3d 352, the trial court found that the Bank violated the CLRA, the UCL, and the false advertising act, and awarded $284,385,741 in compensatory and restitutionary damages to class members, concluded that each class member suffered substantial economic or emotional damage meriting the $1,000 in statutory damages awarded by the jury to eligible class members, enjoined the Bank from continuing to violate the CLRA, and awarded attorney fees and costs to plaintiffs.

The Court of Appeal reversed the trial court's judgment, holding that *Kruger* did not apply to the Bank's practice of debiting overdrafts and charging NSF fees to account holders who deposited public benefit funds. We

granted review to consider whether the Bank's practice violated our holding in *Kruger*, and, if so, whether federal law preempted application of a state law prohibiting the setoff of overdrafts and NSF fees.

## II. Discussion

■ Miller argues that the Bank's practice of recouping overdrafts from, and charging NSF fees to, class members runs afoul of our holding in *Kruger, supra*, 11 Cal.3d 352, and is inconsistent with the strong public policy prohibiting the setoff of exempt public benefit funds. The Bank argues, and the Court of Appeal agreed, that the Bank's practice is nothing more than routine internal account balancing, and is distinct from the setoff of independent debt prohibited in *Kruger*. While the Bank's practice here implicates to some extent the policy considerations at issue in *Kruger*, we are ultimately persuaded that the practice of recouping overdrafts and charging NSF fees is not prohibited by our decision in *Kruger*. Our conclusion is bolstered by Financial Code section 864, which limits the manner in which banks may set off debts, but expressly excepts overdrafts and bank fees from those limitations.

In *Kruger*, Jean Kruger maintained a checking account and a credit card account with Wells Fargo Bank. (*Kruger, supra*, 11 Cal.3d at p. 356.) She deposited into her checking account her unemployment compensation and state disability benefits, which were her only sources of income. (*Ibid.*) Without notifying Kruger in advance, Wells Fargo deducted $87.68 from her checking account, which was the entire balance of the account, and applied it against a delinquency in her credit card account. (*Ibid.*) Wells Fargo refused to honor several checks that Kruger had written before the funds were deducted from her account and billed her $44.00 in service charges for the dishonored checks. (*Ibid.*)

■ We held that the bank was prohibited by statute from using the funds in Kruger's checking account to satisfy the delinquency in her credit card account, because the funds consisted of exempt unemployment and disability benefits. (*Kruger, supra*, 11 Cal.3d at p. 370.) We explained that a bank may not exercise its right of setoff against deposits of state disability insurance and unemployment compensation because "[f]unds derived from such sources are exempt from attachment and execution" by statute. (*Id.* at p. 367.) Although a "banker's setoff" is not the same as attachment and execution, which are expressly prohibited by the statutes, we held that "there is no relevant difference between the two procedures as to the state objective of protection of unemployment compensation and disability benefits from claims

of creditors. The assertion of a banker's setoff has exactly the same effect as a third party's levy of execution on the account—it deprives the depositor of the income which the state provided him to meet subsistence expenses, compelling the state either to give him additional money or leave him without means of physical survival." (*Id.* at pp. 370–371, fn. omitted.)

██ Our decision in *Kruger* recognized that public benefits such as unemployment compensation and state disability insurance benefits exist to provide subsistence income to a person who recently lost a job (in the case of unemployment compensation) or to a person "whose unemployment stems from an illness or injury not covered under workmen's compensation." (*Kruger, supra*, 11 Cal.3d at p. 370.) The Legislature's objective in providing unemployment compensation and disability insurance benefits would be thwarted if those funds were subject to attachment or execution. (*Ibid.*) Permitting "a banker's setoff against unemployment and disability benefits diverts money intended by the state to pay the current living expenses of the unemployed and the disabled into payment of *past debts* accumulated by the bank, leaving the intended beneficiaries no alternative but to seek additional relief from the state." (*Id.* at p. 367, italics added.)

Here, unlike in *Kruger*, the Bank is not setting off independent, past debt. Instead, the transaction occurs within a single account and is triggered by a customer's overdraft, causing the Bank to recoup those funds from a subsequent deposit, and charge an NSF fee. In *Kruger*, we concluded that the setoff of exempt funds to satisfy debts *external* to the bank customer's checking or savings account was unlawful. (*Kruger, supra*, 11 Cal.3d at p. 370.) Plaintiffs urge us to view the fact that the Bank is balancing and charging fees within a single account as indistinguishable from a bank's setoff of debt external to a customer's account, and to extend *Kruger* to the present case. We do not agree with plaintiffs that there is no meaningful difference between satisfying a debt external to an account and recouping an overdraft of an account from funds later deposited into that same account.

██ We are certainly mindful of the strong public policy reasons underlying our decision in *Kruger*, and we recognize that the statutes at issue in *Kruger* are similar to the statutes implicated here, exempting Social Security and other public benefit funds from attachment. Indeed, just as Code of Civil Procedure former section 690.175[4] and Unemployment Insurance Code

---

[4] Code of Civil Procedure, former section 690.175, provided, "State unemployment compensation [and other enumerated state] benefits . . . shall be exempt without filing a claim of exemption, as provided in Section 690.50 [setting forth exemption proceedings]." (As amended by Stats. 1982, ch. 1072, § 2, p. 3856; repealed by Stats. 1982, ch. 1364, § 1, p. 5070.)

former section 1342 (the statutes at issue in *Kruger*) prohibited the attachment or execution of exempt public benefit funds, Code of Civil Procedure section 704.080 provides that an account into which Social Security payments are directly deposited "is exempt to the extent that it consists of payments of public benefits or social security benefits" authorized by the Social Security Administration. (Code Civ. Proc., § 704.080, subd. (c).)[5]

Plaintiffs emphasize the policy concerns addressed in *Kruger*, namely, that the "objective in providing [public] . . . benefits—to furnish the [recipient] . . . and his [or her] family with a stream of income to defray the cost of their subsistence—would obviously fail if creditors could seize that income and apply it to *past debts*. Consequently the Legislature provided that [public] . . . benefits cannot be subjected to attachment or execution." (*Kruger, supra*, 11 Cal.3d at p. 370, italics added.) By concluding that banks may recoup overdrafts and charge NSF fees from public benefit recipients, we do not intend to diminish the significance of preserving public benefit funds for "defray[ing] the cost of . . . subsistence." (*Ibid.*) However, it is far from clear that this policy is undermined when banks recoup overdrawn balances from subsequently deposited public benefit funds. Indeed, an overdraft may be the result of the bank honoring, rather than bouncing, a rent or utility payment made prior to the deposit of benefit funds. Requiring banks to dishonor checks can harm the customer's credit rating, result in the customer's incurring fees, and affect the customer's relationship with merchants. In this case, policy concerns about the setoff of independent debt—at issue in *Kruger*—are not present here, where the credits and debits occur in a single account.

■ The Legislature recognized the distinction between the setoff of independent debt and the recoupment of overdrafts and bank charges in Financial Code section 864, which comprehensively regulates the manner in which banks may exercise their right of setoff. Financial Code section 864 limits a bank "in exercising any setoff for a debt claimed to be owed to the bank by a customer in that a setoff shall not result in an aggregate balance of less than one thousand dollars," and describes the notice and opportunity to

---

[5] Code of Civil Procedure sections 704.110 and 704.120 also exempt from attachment—with certain limitations for child and spousal support payments—public retirement benefits and unemployment insurance and compensation benefits. Code of Civil Procedure section 704.170 exempts social services aid payments from attachment, without limitation. As noted in the text, just as Code of Civil Procedure, former sections 690.175, 690.18, 690.30, and Unemployment Insurance Code former section 1342 exempted the public benefit funds at issue in *Kruger* from attachment, Code of Civil Procedure sections 703.010, 704.080, 704.110, 704.120, and 704.170 exempt the funds at issue here from attachment.

object that a bank must provide a customer prior to setting off debt. (Fin. Code, § 864, subds. (b), (c).) Debt is defined in the statute to *exclude* "a charge for bank services or a debit for uncollected funds or for an overdraft of an account imposed by a bank on a deposit account." (Fin. Code, § 864, subd. (a)(2).)

Plaintiffs argue that Financial Code section 864 serves two purposes—it ensures that banks provide notice to customers prior to exercising a setoff, and it prohibits the setoff of funds resulting in a balance of less than $1,000. Plaintiffs argue that the Legislature excluded NSF fees and overdrafts from Financial Code section 864's definition of debt because the Legislature intended that funds exempt from setoff would never be subject to the recoupment of overdrafts and charge of NSF fees, and the Legislature therefore never intended that banks would give notice prior to setting off exempt funds. Plaintiffs also suggest that because the statute prohibits the setoff of funds resulting in a balance under $1,000, the exclusion of bank charges and overdrafts from the definition of debt has no impact on the present case because the setoff of overdrafts and NSF fees necessarily would apply only to a balance of less than $1,000.

The Court of Appeal reasoned that Financial Code section 864's "different treatment for overdrafts and bank charges signals the Legislature's view that internal account balancing is different from the practice of setting off separate debt against a deposit account, does not implicate the same considerations, and does not warrant the same legal treatment." The Bank similarly contends that because Financial Code, section 864 "expressly excludes internal overdraft and fee balancing from its restrictive scheme, . . . a bank need not provide the statutory notice when it balances fees or overdrafts, and customers cannot assert an exemption under the statute from those practices."

■ To determine the Legislature's intent, we begin by analyzing the statutory language. (*Olson v. Automobile Club of Southern California* (2008) 42 Cal.4th 1142, 1147 [74 Cal.Rptr.3d 81, 179 P.3d 882] (*Olson*).) The language of Financial Code section 864 is plain: "For the purposes of this section: [¶] . . . [¶] . . . '[d]ebt' . . . does not mean a charge for bank services or a debit for uncollected funds or for an overdraft of an account imposed by a bank on a deposit account." (Fin. Code, § 864, subd. (a)(2).) ■ The statute proscribes a bank's ability to set off "debt" if the customer's balance would be reduced to less than $1,000, and requires that a bank provide a customer with notice when it exercises its right to set off a "debt." (Fin. Code, § 864, subds. (b), (c).) Thus, the statute expressly provides that the types of funds at issue here—overdrafts and NSF fees—do not constitute debt.

Accordingly, without regard to whether a customer's balance would fall below $1,000, and without having to notify a customer prior to exercising its right of setoff, a bank may recoup overdrafts and charge NSF fees pursuant to Financial Code section 864.

■ Plaintiffs also argue that a plain reading of the statute reveals that its purpose was not "to overrule this Court's decision in *Kruger*." While that appears to be true, it does not follow that the Legislature intended that overdrafts and NSF fees could not be recouped from public benefit funds. Although we need not look to extrinsic sources to discern legislative intent when the statutory language is susceptible of only one reasonable interpretation (see *Olson, supra*, 42 Cal.4th at p. 1147), an examination of the legislative history supports our conclusion that Financial Code section 864 was aimed at protecting customers from a bank's potentially unlawful or unfair exercise of its right of setoff while simultaneously excluding overdrafts and NSF fees from the statute's reach.

The Legislature's concern in passing Assembly Bill No. 711, codified as Financial Code section 864, was that bank accounts were "often [being] wiped out by the banks' taking their [customers'] assets to pay outstanding credit card balances owed. The customer deserves to have some protection from this practice." (Sen. Democratic Caucus, Analysis of Assem. Bill No. 711 (1975–1976 Reg. Sess.) as amended June 5, 1975.) The bill proposed to "solve[] the problem of the hostage bank account by denying a bank an equitable right of setoff with respect to funds of a customer held in a deposit account and by requiring banks to invoke orthodox judicial proceedings to attach bank deposits." (Assem. Com. on Finance, Ins. and Commerce, Analysis of Assem. Bill No. 711 (1975–1976 Reg. Sess.) as amended Apr. 16, 1975, p. 2.)

Indeed, the Governor was advised to sign the bill, in a document acknowledging that it was a "small step in [the] right direction." (Dept. Consumer Affairs, Enrolled Bill Rep. on Assem. Bill No. 711 (1975–1976 Reg. Sess.) Sept. 11, 1975, p. 1.) Financial Code section 864 was enacted to prohibit a bank from using setoff as "nothing more than a form of nonstatutory, nonjudicial prejudgment attachment applied on a continuing basis to what may be considered a 'necessity of life,' without even the minimal protection of subsequent adjudication. Seizure of funds in deposit accounts should be limited. Consumers should, *at a minimum*, be provided notice and a chance to contest such seizure." (Dept. Consumer Affairs, Enrolled Bill Rep., *supra*, at p. 2.)

Protecting consumers, including public benefit recipients, from unfair or unlawful setoff does not mean, as plaintiffs suggest, that banks must be prohibited from recouping overdrafts and charging NSF fees under Financial Code section 864. Plaintiffs criticize the Court of Appeal's conclusion that excluding overdrafts and bank charges from the statute's definition of debt "signals the Legislature's view that internal account balancing is different from the practice of setting off separate debt against a deposit account" as "illogical and unsupported by any evidence of legislative intent." However, the plain language and the history of the statute compel a contrary conclusion.

The bill was twice amended in 1975 before the definition of debt currently found in the statute was added to the proposed language. (Assem. Bill No. 711 (1975–1976 Reg. Sess.) as amended May 29, 1975.) In April 1975, when the amendment containing the current definition of debt was proposed, the bill was opposed by the California Bankers' Association and the California Credit Union League. (Assem. Com. on Finance, Ins. and Commerce, Analysis of Assem. Bill No. 711 (1975–1976 Reg. Sess.) as amended Apr. 16, 1975, p. 3.) However, by September 11, 1975, the bill had "no opposition as the sponsor, author, and financial institutions have worked closely together." (Dept. Consumer Affairs, Enrolled Bill Rep. on Assem. Bill No. 711 (1975–1976 Reg. Sess.) Sept. 11, 1975, p. 1.) It is reasonable to conclude that the former opponents of the bill successfully sought to amend the language to exclude internal account balancing from the statute's reach, particularly in light of the documents suggesting that financial institutions "worked closely" with the bill's authors and sponsors. In any event, while the materials do not reveal precisely why, or at the behest of whom, the definition of debt was amended to exclude overdrafts and bank charges, it is clear from the statutory language that the Legislature intended to treat charges for overdrafts and NSF fees differently from the setoff of independent debt by limiting a bank's ability to engage in the latter while expressly permitting the former.

Our interpretation of Financial Code section 864, as well as our conclusion that *Kruger* does not prohibit the Bank's internal balancing practices, are consistent with the Office of the Comptroller of the Currency's (OCC) interpretation of analogous federal law. Following our grant of review in this case, the OCC issued Interpretive Letter No. 1082 (June 2007) (Letter), upon which the Bank relies. The Letter responds to two inquiries posed by a bank to the OCC: first, "with respect to deposit accounts [a bank] maintains for its customers in California," whether the bank "is authorized under the National Bank Act and regulations of the OCC" to permit customers to overdraw their accounts, recoup overdrafts, and charge NSF fees where the bank's agreements with its customers permit such activity; and second, whether a bank's "overdraft practices . . . constitute an exercise of a 'right to collect debts' for purposes of the OCC's regulations concerning the applicability of state law to

a national bank's deposit-taking activities."[6] (Letter, at p. 1.) The OCC notes that the bank in question "does not differentiate based on the source of funds—such as the deposit of Social Security benefits or other public benefits payments—held in the depositor's account." (*Id.* at p. 2.)

The OCC concluded that a national bank may "honor items for which there are insufficient funds in depositors' accounts and recover the resulting overdraft amounts as part of the [b]ank's routine maintenance of these accounts; and . . . establish, charge and recover overdraft fees from depositors' accounts for doing so" (Letter, at p. 1) without running afoul of 12 United States Code section 24, paragraph seventh, or 12 Code of Federal Regulations part 7.4002 or 7.4007 (2009). (Letter, at p. 7.)[7] The OCC explained that "the processing of an overdraft and recovery of an overdraft fee by balancing debits and credits on a deposit account are activities directly connected with the maintenance of a deposit account. Fundamentally, the [b]ank is not creating a 'debt' that it then 'collects' by recovering the overdraft and the overdraft fee from the account." (Letter, at p. 6.)

---

[6] We note that in *Lopez v. Washington Mut. Bank, FA* (9th Cir. 2002) 302 F.3d 900, the Ninth Circuit also addressed the distinction between internal account reconciliation and the setoff of independent debt, and reached a conclusion, in line with ours here, that *Kruger*'s prohibition of the setoff of independent debt does not apply to the Bank's practice of recouping overdrafts and charging NSF fees. In *Lopez*, the court concluded that because depositors voluntarily consented to Washington Mutual's overdraft practices, analogous to the Bank's practices here, no violation of the federal statutes prohibiting the attachment of exempt Social Security and SSI funds occurred. (*Lopez, supra*, 302 F.3d at p. 904.) While the decision in *Lopez* ultimately rested on depositors' consent to the bank's recoupment of overdrafts, the court distinguished a Tenth Circuit case prohibiting the setoff of public benefit funds because, in that case, the bank "used the Social Security deposits to satisfy a separate, preexisting debt unrelated to the operation of the depositor's checking account." (*Lopez, supra*, 302 F.3d at p. 906, analyzing *Tom v. First American Credit Union* (10th Cir. 1998) 151 F.3d 1289, 1293.)

[7] The parties dispute the deference owed to the position espoused by the OCC in the Letter. As a general matter, we owe deference to reasonable agency interpretations of agency-promulgated regulations, including the OCC's interpretations of its regulations interpreting federal banking law. (See *NationsBank of N. C., N. A. v. Variable Annuity Life Ins. Co.* (1995) 513 U.S. 251, 256 [130 L.Ed.2d 740, 115 S.Ct. 810]; *Olszewski v. Scripps Health* (2003) 30 Cal.4th 798, 821 [135 Cal.Rptr.2d 1, 69 P.3d 927].) The underlying interpretative regulation, however, is entitled only "to consideration and weight, but would not be binding on the courts." (*Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 936 [216 Cal.Rptr. 345, 702 P.2d 503].) Moreover, we here "confront an interpretation contained in an opinion letter, not one arrived at after, for example, a formal adjudication or notice-and-comment rulemaking. Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant . . . deference." (*Christensen v. Harris County* (2000) 529 U.S. 576, 587 [146 L.Ed.2d 621, 120 S.Ct. 1655].) We need not decide the level of deference owed to the OCC's opinion letter because the agency's interpretation expressly does not address "the applicability of any state law to national banks," and is consistent with, but does not alter, our conclusion that the Bank's practice is not prohibited by our holding in *Kruger* or by Financial Code section 864. (Letter, at p. 6.)

## III.   Disposition

The judgment of the Court of Appeal is affirmed.[8]

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Corrigan, J., and Nares, J.,[*] concurred.

---

[8] Because we conclude that the Bank's practice of recouping overdrafts and charging NSF fees is not inconsistent with our decision in *Kruger*, and is permissible under Financial Code section 864, we need not reach the preemption question.

[*] Associate Justice, Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.